789IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| IN THE MATTER OF THE COMPLAINT AGAINST ANTHONY SCIBELLI | Case No. 19mj 3130 (KAR) |
|---|---|

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A COMPLAINT**

I, Michael R. Sheehan, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and acting as such. I have been a Special Agent with the FBI since February 2011, and as such, I have received formal training in identifying and investigating violations of federal law to include the collection of loans by extortionate means. I have experience in organized crime investigations as well as techniques associated with such investigations to include conducting surveillance, executing searches pursuant to court-ordered search warrants, executing arrests, and participating in court-authorized Title III wiretaps of cellular phones.

2. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 894: Collection of Extensions of Credit by Extortionate Means (the "Specified Federal Offense"), have been committed by ANTHONY J. SCIBELLI ("SCIBELLI").

3. Title 18 of United States Code, Section 894 makes it a crime for anyone who "knowingly participates in any way, or conspires to do so, in the use of any extortionate means (1) to collect or attempt to collect any extension of credit, or (2) to punish any person for the non-repayment thereof."

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended

to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

5. On or about May 8, 2019, a confidential human source[1] ("CHS"[2]) was interviewed by the FBI and Massachusetts State Police ("MSP"). The CHS reported that s/he borrowed approximately $5,000[3] from SCIBELLI in late 2016 or early 2017.

6. The CHS made a monthly payment of $1,300 for approximately two years for payments on the loan totaling between $26,000 and $39,000.[4]

7. The CHS also advised investigators that s/he was approximately one week late on the most recent $1,300 payment. According to the CHS, SCIBELLI and Individual #1 were known to use violence or threats of violence to collect loan payments and thus the CHS feared for his/her safety. The CHS reported that SCIBELLI had already attempted to locate the CHS at the CHS's residence in an attempt to collect the $1,300 payment. While at the CHS's residence, SCIBELLI threatened the CHS's sister because SCIBELLI suspected she was helping the CHS avoid his collection efforts.

---

[1] *See* Attachment A, filed under seal.

[2] "[CHS]" has been substituted for the CHS's name or a pronoun which tends to identify the CHS.

[3] The CHS has been interviewed by investigators on multiple occasions and has provided different figures for the initial amount of the loan ranging from $5,000 to $6,500. $5,000 was the figure the CHS reported during the first interview.

[4] As with the initial amount of the loan, the CHS has provided multiple estimates of the total amount of monthly payments the CHS had paid to date. The CHS first reported $26,000 but later calculated a figure of approximately $39,000 (or 30 months x $1,300 per month).

8. On or about May 10, 2019, at the direction of the FBI and MSP, the CHS arranged a meeting with SCIBELLI via a series of recorded telephone calls. Investigators provided the CHS with an FBI recording device and $1,300 of agency funds. Investigators instructed the CHS to meet with SCIBELLI to pay him the $1,300 of agency funds as a monthly payment on the $5,000 debt.

9. The meeting between the CHS and SCIBELLI took place in the vicinity of Wilbraham Road and Parker Street in Springfield, Massachusetts at approximately 2:30 p.m. Investigators conducting surveillance observed SCIBELLI arriving while driving a white Nissan Murano, bearing Massachusetts License Plate # 9MWJ10.[5] The meeting was audio and video recorded.

    a. The video recording of the meeting captured the CHS handing the $1,300 of agency funds into the driver-side window of the white Murano.

    b. During the meeting, the CHS and SCIBELLI discussed SCIBELLI's previous attempts to locate the CHS at the CHS's home. An excerpt from the audio recording of that conversation is as follows:

> SCIBELLI: ...Listen, um, I did abuse your brother in-law but I was very nice to your sister.
>
> CHS: ...she's my sister. You told her that if she's covering for [CHS], or I find out your brother or anybody is covering for [CHS], I'm going to beat the fuck out of you...

---

[5]Massachusetts RMV records indicate this vehicle is a 2014 Nissan Murano, white in color, registered to Josie Scibelli.

> SCIBELLI: *No, I said it to him, I said it to him. I did say that to him.[6] I was abusive to [brother in-law].[7]*

Later in the same conversation, after the CHS handed SCIBELLI the $1,300 payment, the CHS and SCIBELLI had the following conversation:

> CHS: *I still owe you $40 that you let me borrow…remember?*
>
> SCIBELLI: *I'm more concerned about the thirteen you are behind on.*
>
> CHS: *I'm not behind on thirteen.*
>
> SCIBELLI: *Yeah, you're behind thirteen-hundred.*

Based on my knowledge of the investigation to date, I believe SCIBELLI's reference to "thirteen" and "thirteen-hundred" is a reference to the monthly payment of $1,300 owed to SCIBELLI by the CHS.

    c. The conversation then returned to SCIBELLI's treatment of the CHS's brother-in-law when SCIBELLI stated:

> SCIBELLI: *I did tell [brother-in-law] I was going to hit him with his wife's walker. I think I said "I'm going to take [sister]'s[8] walker and hit you with it."*

---

[6] Based on the context of the conversation, I believe "him" to reference the CHS's brother-in-law, who was present with the CHS's sister when SCIBELLI attempted to locate the CHS at his/her residence.

[7] The name of the CHS's brother-in-law was used in the conversation but omitted to avoid identifying the CHS.

[8] The name of the CHS's sister was used in conversation but omitted to avoid identifying the CHS.

    d. The conversation turned to the CHS's payment history:

        *CHS:  In two and-a-half years, really you didn't have any problems with me.*

        *SCIBELLI:  [unintelligible].*

In this exchange, I believe the CHS is referencing his/her consistent monthly payments to SCIBELLI for the last 2.5 years. Although SCIBELLI's response is not intelligible, it is my belief the tone and inflection of his voice are consistent with an individual expressing agreement. I believe SCIBELLI is confirming he has been collecting money from the CHS for a period of approximately 2.5 years.

10. On or about May 29, 2019, investigators provided the CHS with a recording device and instructed him/her to approach SCIBELLI at the Mount Carmel Club on Main Street in Springfield.

11. The recording device captured a conversation between the CHS and SCIBELLI in which the CHS asked SCIBELLI if s/he should ask Individual #1 for a reduction in monthly payment.

    a. The CHS and SCIBELLI engaged in the following conversation:

        *CHS:  I know what I pay a month right?*

        *SCIBELLI:  Yeah.*

        *CHS:  I already know that. Should I see the other kid about making some kind of deal where I can fucking pay less or something? It's over two years...*

        *SCIBELLI:  Go ahead and talk to him, I just give it to him when you give it to me. It has nothing to do with me.*

5

> *CHS: Yeah but I mean, I know the way the business works…but I paid the fucking guy twenty-six thousand back…I know the way the business works.*
>
> *SCIBELLI:   Yeah.*
>
> *CHS:   That's not what it is. What I'm saying is I should be able to say to him, you know, "can't you lower it a little bit or do something?" I'm just saying…*
>
> *SCIBELLI:   I would do the same thing. I would have done it last year.*
>
> *CHS:   But I try to do the right thing every month*
>
> *SCIBELLI:   Yeah, but I would have done it last year tried to get it lowered or… [unintelligible]*

12. According to the CHS, SCIBELLI expected another $1,300 payment on June 3, 2019. At the direction of the FBI, the CHS did not make this payment. On June 4, 2019, at approximately 6:30 a.m., the CHS used an FBI recording device to record a telephone call with SCIBELLI.

13. On or about June 5, 2019, the CHS engaged in a series of recorded calls with SCIBELLI.

    a. During the call, SCIBELLI requested a meeting with the CHS and the CHS attempted to arrange a meeting between the CHS, SCIBELLI, and Individual #1, referred to below as "our friend".

    b. The following is an excerpt of the conversation:

> *SCIBELLI:   Good morning, [CHS].*
>
> *CHS: What's going on?*

6

> SCIBELLI: What time can I see you?
>
> CHS: ...I'm going to try to see you and our friend together, ok?
>
> SCIBELLI: That ain't gonna happen. He doesn't want to hear nothing. He doesn't care, [CHS].
>
> CHS: oh ok, so he said...he said for you to deal with it and that's it, right?
>
> SCIBELLI: Huh?
>
> CHS: He told you to just deal with it and that's it right?
>
> SCIBELLI: [CHS], don't put me in the middle of this shit. What do you want to do?
>
> CHS: I'm going to see you this morning ok?
>
> SCIBELLI: Alright, call me.

Based on my knowledge of the investigation and the timing and context of the call, I believe that SCIBELLI called the CHS to collect the $1,300 owed to him on June 3, 2019. When SCIBELLI tells the CHS, "That ain't gonna happen. He doesn't want to hear nothing. He doesn't care," I believe, based on the investigation and the context of the conversation, he is indicating that Individual #1 will not entertain any negotiation on the CHS's payment as discussed during the conversation on May 29, 2019.

At approximately 10:30 a.m. on June 4, 2019, the CHS used an FBI recording device to record another telephone call with SCIBELLI.

    c. The following is an excerpt from that call:

> SCIBELLI: [unintelligible]...where are you [CHS] so we can have a little meeting? Where are you?

7

> *CHS: Well, what kind of meeting I had a meeting with y...*
>
> *SCIBELLI: Well [CHS]... [unintelligible] you get your check on the third that's the way we do it. [Unintelligible] the fucking bull shit.*
>
> *CHS: Alright but what I'm saying to you is did I come to you and talk to you like a gentleman and try to work...*
>
> *SCIBELLI: [interrupts] Yeah you did and I talked you like a gentleman and the kid's not having that. He don't want to hear it. I'm sorry [CHS], I didn't borrow the money, you did.*
>
> *CHS: Right, but I paid you thirty-eight thousand back, ok?*
>
> *SCIBELLI: [Unintelligible]*
>
> *CHS: Yeah okay, I'll call you back.*

Based on the conversation above, I believe that SCIBELLI is attempting to arrange a meeting with the CHS to collect the $1,300 that was due on June 3, 2019. When SCIBELLI says, "the kid's not having that. He don't want to hear it," I believe he is again referring to Individual #1's unwillingness to negotiate the CHS's monthly payment. I believe that SCIBELLI's reference to the CHS getting a "check on the third" is a reference to the CHS receiving a social security benefit check on the third of each month.

    d. During a call which took place at approximately 9:10 a.m., the CHS and SCIBELLI had a conversation which included the following:

> *CHS: So everybody is looking for me in the city, right, or whatever? Whatever.*
>
> *SCIBELLI: No. No one's looking for you.*

> CHS: Oh ok. Well, whatever.

The CHS then asks SCIBELLI to call back in one hour.

e. At approximately 11:00 a.m., SCIBELLI called the CHS. An excerpt of their recorded conversation is as follows:

> SCIBELLI: [CHS], what's up?
>
> CHS: what's going on?
>
> SCIBELLI: I need to see you, my friend.
>
> CHS: Yeah I know that, you've been saying it since Monday, right?
>
> SCIBELLI: Well, yeah, well Monday was the third [CHS], you know...

f. SCIBELLI and the CHS discussed potential locations for a face-to-face meeting. Then the following conversation took place in reference to the $1,300 payment:

> CHS: I know what you're expecting but I don't have what you're expecting.
>
> SCIBELLI: Well [CHS], let me just see you and we can talk in person.

Through this call and another, SCIBELLI and the CHS agreed to meet at a McDonald's on Allen Street in Springfield later on June 5, 2019.

14. On or about June 5, 2019 at approximately 4:40 p.m., SCIBELLI and the CHS met at a McDonald's on Allen Street in Springfield. The meeting was audio/video recorded and observed by investigators conducting surveillance.

a. SCIBELLI and the CHS engaged in a conversation regarding the money owed by the CHS to SCIBELLI. An excerpt of the conversation is as follows:

>CHS:   So Monday is the third, today is the fifth. That's two days late.
>
>SCIBELLI:   Right.
>
>CHS:   Right? Ok so last time you got the full amount…
>
>SCIBELLI:   Right.
>
>CHS:   After seven days, right?
>
>SCIBELLI:   Right, right.
>
>CHS:   So why is everybody so crazy about three or four day's difference?
>
>SCIBELLI:   I don't know if that's your brother torturing you or whatever, but I just need the money to give to the fucking kid.
>
>CHS:   I know what you're saying.
>
>SCIBELLI:   [Unintelligible]
>
>CHS:   I'm going to have the money. I'm getting it together.
>
>SCIBELLI:   What do you mean getting it together?
>
>CHS:   No I am getting it together.
>
>SCIBELLI:   [CHS], [unintelligible] the fucking money.
>
>SCIBELLI:   [unintelligible] just give to me. [CHS] they're driving me crazy. Where the fuck's the money you get your check on the third.

b.   An excerpt of a subsequent part of the conversation is as follows:

>SCIBELLI:   [CHS], just give me the money, [CHS].
>
>CHS:   I don't need much more. I want to pay the whole thing.

>SCIBELLI: Well give me some money right now then.
>
>CHS: Let me see what I got…
>
>SCIBELLI: I don't like being in the middle of this. I wish you'd just fucking deal with them and… [unintelligible] be left out of it.
>
>CHS: I'll give you two hundred right now. And I'll give you more.
>
>SCIBELLI: When are you going to have the rest [CHS]? I don't want to be with this…I don't want to be dealing with this.
>
>CHS: I know…
>
>SCIBELLI: I want you to be dealing with them.
>
>CHS: [unintelligible]…I know.
>
>SCIBELLI: When you gonna have the rest of it [CHS]?
>
>CHS: I'm going to call you tomorrow morning.
>
>SCIBELLI: [unintelligible] Please have some [CHS].
>
>CHS: Ok yeah, because you, because you get tortured every day.
>
>SCIBELLI: Can you work something out so I don't have to deal with you no more? Deal with them…I don't want to deal with Albert.
>
>CHS: Yeah but I tried to deal with…listen.
>
>SCIBELLI: He don't want to hear nothing, you owe him the money that's [unintelligible].

At the conclusion of this meeting, the CHS reported paying SCIBELLI $200 of the CHS's personal money.

15. On or about June 6, 2019, the CHS received a phone call from SCIBELLI that was recorded using an FBI recording device.

11

a. An excerpt of the conversation is as follows:

> CHS: What's going on?
>
> SCIBELLI: Nothing, what's going on? You tell me.
>
> CHS: ...I don't know if you want to see the kid or, I really don't know...I don't know what you wanna, if you wanna see somebody and just tell them that, "you know what"....I know I only gave ya, I guess, two hundred yesterday, is that correct?
>
> SCIBELLI: Look [CHS], where are you?
>
> CHS: Listen let me tell you this, ok? I wanna tell you what I wanna tell you. You want to hear it? Or you don't?
>
> SCIBELLI: [CHS], tell me in person. You're already talking too stupid on the phone, honey.
>
> CHS: What's "talking stupid" for? I don't know what you mean...
>
> SCIBELLI: Can't I just meet... [unintelligible]...I'm by your house just come outside for a minute.
>
> CHS: I'm not at my house right now.
>
> SCIBELLI: Well where are you?
>
> CHS: Listen, Ant, you know the money that I pay every month?
>
> SCIBELLI: Yeah.
>
> CHS: Okay, I have a problem. And I tried to go to both of you guys to talk about it, to try to work out something. And nobody wants to hear my problem and my expenses that I got and all that. Nobody

> *gives a fuck about that. So, I don't know if you want to just relay a message, but I have no money. I have no money. Ok?*
>
> *[audible tone indicating the call has been disconnected]*

Based on SCIBELLI's statement "you're already talking too stupid on the phone, honey," I believe SCIBELLI believed the conversation was incriminating and might be recorded.

16. On or about June 14, 2019, the CHS received a call from SCIBELLI that was recorded using an FBI recording device.

   a. During the call, SCIBELLI asked the CHS to help a cousin of Individual #1 obtain a motor vehicle inspection sticker through a contact at an inspection station. SCIBELLI briefly transitioned to a conversation about the CHS's loan as follows:

   > *SCIBELLI: ...and secondly, are we going to be back on track the first of the month?*
   >
   > *CHS: I'm gonna talk, listen...*
   >
   > *SCIBELLI: I know who you said you was gonna talk to. That's fine talk with him.*

Although it is not clear why SCIBELLI references the "first of the month" rather than the third (which is the CHS's typical due date), I believe this call is another attempt by SCIBELLI to arrange for collection of the CHS's debt. Based on the context of other recorded calls, I believe the third individual referenced in this conversation as "him" is Individual #1.

17. On or about June 19, 2019, investigators provided the CHS with an FBI recording device and instructed him/her to approach Individual #1 at the Mount Carmel Club.

18. Investigators from the FBI and MSP established surveillance in the vicinity of the Mount Carmel Club at approximately 10:50 a.m. At approximately 12:23 p.m., investigators

observed SCIBELLI arrive at the Mount Carmel Club driving a white Chevrolet pick-up truck, bearing Massachusetts License Plate #1CMM65.[9] SCIBELLI was accompanied by an individual known to investigators.

   a. Investigators observed SCIBELLI and the second individual exit the pick-up truck and approach the CHS who was standing outside in the vicinity of the building's southwest corner. Investigators observed SCIBELLI and the CHS speak briefly before SCIBELLI used his hands to strike the CHS multiple times in the head and face. SCIBELLI and the CHS separated briefly and appeared to speak again. SCIBELLI then re-approached the CHS and used his hands to strike the CHS multiple times in the head and face. The CHS then left the area. A video of the encounter was captured and recovered by the Springfield Police Department from a municipal camera.

   b. The following is an excerpt of the encounter between SCIBELLI and the CHS as captured by the audio recorder attached to the CHS:

> *Unknown Male in Background:* Anthony!
>
> *CHS:* I don't know. Jake – Jake was standing there talking to me…
>
> *SCIBELLI:* What?
>
> *CHS:* Jake was standing there talking to me. Right on the corner…
>
> [Sounds of a scuffle begin, approximately four impacts can be heard]
>
> *SCIBELLI:* [unintelligible]…my fucking money. You fucking cunt.
>
> [Scuffling stops]

---

[9] Massachusetts RMV records indicate this vehicle is a 1998 Chevrolet pickup, white in color, registered to ANTHONY SCIBELLI.

> *SCIBELLI:    You understand me? Have it all on the fucking first.*
>
> *CHS:   Ok, so you just slapped me like four times in the face, right? And you kicked my phone in the street.*
>
> *SCIBELLI:    Yeah, you want some more?*
>
> *CHS:   No, I don't want no more.*
>
> *SCIBELLI:    Yeah.*
>
> *CHS:   You want any?*
>
> *SCIBELLI:    Yeah, I'm right here.*
>
> *CHS:   No, No I'm not doing nothing.*
>
> *SCIBELLI:    I'm right here…*
>
> *[Sounds of a scuffle begin, an impact can be heard]*
>
> *SCIBELLI:    I'm right here you fucking cunt.*
>
> *[Sounds of scuffle stop]*
>
> *CHS:   Ok. Ok. Anthony, you're my good friend…*
>
> *SCIBELLI:    [unintelligible] Keep talking…*
>
> *CHS:   You're my good friend. Ok?*

Based on the interaction above and my knowledge of the investigation, I believe when SCIBELLI said "[unintelligible] my fucking money," he was demanding payment of the debt owed by the CHS and saying something similar to "I want my fucking money" or "give me my fucking money." I believe that SCIBELLI's demand to "have it all on the fucking first" after physically assaulting the CHS was a threat to the CHS to provide the complete $1,300 monthly payment due to SCIBELLI on July 1, 2019.

## **CONCLUSION**

19. Based on the facts set forth in this affidavit, I submit there is probable cause to believe that ANTHONY J. SCIBELLI extended credit to the CHS and used extortionate means, specifically violence and threatened violence, to attempt collection of that credit and to punish the CHS for non-repayment thereof, in violation of the Specified Federal Offense.

Respectfully submitted,

_____
Michael R. Sheehan
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on this Second day of July, 2019

_____
Katherine A. Robertson
UNITED STATES MAGISTRATE JUDGE